NOT DESIGNATED FOR PUBLICATION

No. 126,474

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of L.A., a Minor Child.

MEMORANDUM OPINION

Appeal from Geary District Court; KEITH L. COLLETT, judge. Submitted without oral argument. Opinion filed September 13, 2024. Affirmed in part, reversed in part, and remanded with directions.

*Anna Jumpponen*, of SJ Law, L.L.C., of Wichita, for appellant natural father.

*Krista Blaisdell*, county attorney, for appellee.

Before GARDNER, P.J., GREEN and HILL, JJ.

PER CURIAM: Father appeals the termination of his parental rights (TPR) over L.A., who was born in November 2018. Father asserts that the district court erred when terminating his parental rights because the State failed to present clear and convincing evidence that he was unfit by reason of conduct or condition to properly care for L.A. and was unlikely to become able to do so within the foreseeable future as stated under K.S.A. 38-2269(a). Father further argues that the district court erred when it terminated his parental rights because it never determined whether terminating his parental rights over L.A. was in L.A.'s best interests as required under K.S.A. 38-2269(g)(1). As considered later, we affirm the district court's parental unfitness ruling because the State presented clear and convincing evidence that Father was unfit and unlikely to become fit to properly care for L.A. in the foreseeable future. Nevertheless, as argued by Father, because the district court never addressed whether termination of his parental rights was in L.A.'s best interests, we reverse the termination of Father's parental rights and remand

1

to the district court for the sole legal determination whether termination is in L.A.'s best interests.

FACTS

On March 30, 2021, the State petitioned the district court to rule L.A. a child in need of care (CINC) for the following reasons: (1) because she was without adequate care, control, or subsistence unrelated to indigency under K.S.A. 38-2202(d)(1); (2) because she was without the care or control necessary to meet her physical, mental, or emotional needs under K.S.A. 38-2202(d)(2); (3) because she had been physically neglected and emotionally abused under K.S.A. 38-2202(d)(3); and (4) because she resided with a four-year-old half sibling (Older Sibling) and an eight-month-old half sibling (Younger Sibling), who were also being physically and emotionally abused under K.S.A. 38-2202(d)(11). To support its petition, the State attached an affidavit written by Megan Sage, a social worker for the Department for Children and Families (DCF). In the State's April 5, 2022 amended petition asking the district court to rule L.A. as a child in need of care, the State also attached Police Officer Gus Falter's affidavit to its petition.

In Sage's affidavit, she discussed DCF's history responding to reports of abuse and neglect by L.A.'s Father and Mother. Sage explained that on August 3, 2020, someone reported that Father and his wife were physically and emotionally abusing L.A. and Older Sibling. She explained that based on this report, DCF opened an investigation because it was concerned that the children were "being disciplined with excessive force," were afraid while "locked and confined in the bedroom," were threatened with "'whoopings,'" were degraded and cursed at, were exposed to Father and his wife's heated arguments, were exposed to Father's and his wife's marijuana use, and were present while Father and his wife had sex. Ultimately, DCF determined the allegations unsubstantiated.

2

Yet, as DCF investigated those allegations, Father and Mother were in the middle of a custody dispute. Father never believed that he was the biological parent of Older Sibling. But he did believe that he was the biological parent of Younger Sibling. Although paternity testing later established that Father was not the biological parent of Younger Sibling, Mother was given custody of Younger Sibling during this dispute. According to Father's testimony at his termination of parental rights (TPR) hearing, however, Father and Mother continued to have an informal custody arrangement. Mother "had the kids and take [*sic*] care of them and [he] went and visit[ed] them every day after [he] got off work."

Regardless, L.A. and her two half siblings were in Mother's physical custody on February 2, 2021. In her affidavit, Sage explained that on February 2, 2021, DCF opened a new investigation regarding the physical neglect of the three children. When a DCF worker visited Mother's home, the worker noted that most of the home "was appropriate." But the worker determined that the living room and kitchen were unsafe. The worker "observed . . . trash covering the home, spilled food covering the kitchen floor and a chair in [the] living room covered in food." The worker reported that there was "food mashed into the living room floor" and something "reported to be chocolate cake smeared and stained onto a chair." Because the DCF worker was concerned about the children based on the condition of Mother's home, DCF scheduled a follow-up appointment with Mother to examine her home on February 8, 2021. Although this was a scheduled walk-through, Mother did not answer the door.

According to Sage's affidavit, it seems that on February 18, 2021, a DCF worker arrived unannounced at Mother's home to complete a walk-through. This worker reported that Mother took several minutes to answer the door, during which the worker could hear Mother say, "'[A]re you fucking kidding me'" to the children. Once Mother allowed the worker inside the home, the worker saw overflowing trash in the kitchen and popcorn kernels throughout the living room. L.A. was naked and Older Sibling's diaper was

"extremely full" and was "falling off." It seems that when the worker asked Mother why L.A. was naked and Older Sibling's diaper was extremely full, she responded that she had left the children in the living room alone "for an extended period of time" while she was in another part of the home.

Sage explained that following this incident, DCF continued to monitor Mother's housing and the children's welfare. DCF also provided Mother services for herself and the children. This included services to help address Older Sibling's aggressive behavior. As DCF workers continued to monitor the children's welfare, the workers noticed that L.A. also started to engage in the same aggressive behaviors that Older Sibling displayed. So, at a "Team Decision Making" meeting on February 24, 2021, the DCF workers involved with helping the family determined that they should ask the district court to rule the three children as children in need of care. In turn, the State petitioned the district court to rule them as children in need of care on March 30, 2021.

In Officer Falter's affidavit in the amended petition, he discussed the welfare check that he responded to on April 20, 2021, which was about a month after the State initially petitioned the district court to rule L.A., Older Sibling, and Younger Sibling as children in need of care. Officer Falter explained that Saint Francis Community Services (Saint Francis), a private social service agency that DCF contracted with to provide case planning services, called police after "receiv[ing] a message and pictures of the three children in dirty diapers, eating moldy or spoiled food off the floor and that there was no walking space due to the mess inside the residence." When the officer responded to the welfare check, he discovered the following: (1) that there were numerous garbage bags at the front door; (2) that there was "[a] diaper full of feces" in the living room and dried feces smeared on a nearby wall; (3) that there "was not a clean spot on the floor to stand"; and (4) that furniture was toppled over and covered with trash and spoiled food. Officer Falter reported that because Mother's house was unsafe as well as the fact that Younger Sibling's diaper had not been changed for some time, law enforcement took custody of

4

the children. He further reported that after being taken into custody, law enforcement noticed marks on Older Sibling's body. When Older Sibling was asked about the injuries, Older Sibling told law enforcement that Mother had bitten and scratched him.

The day after Officer Falter responded to the welfare check, and upon request from the State, the district court entered an order placing L.A., Older Sibling, and Younger Sibling in DCF custody. The district court determined that all three children were children in need of care. It then explained that the children should enter DCF custody because they were likely to sustain harm if not removed from Mother's home. It appointed a guardian ad litem to represent the children's interests, and it appointed attorneys to represent Father and Mother. It also ordered Saint Francis to provide case management services to Father and Mother so L.A., Older Sibling, and Younger Sibling may eventually return to Mother's custody and so L.A. may eventually return to Father's custody.

Father has not included in the record on appeal his and L.A.'s initial permanency plan created by Saint Francis with the goal of reintegrating L.A. with Father. Also, although Saint Francis filed court reports discussing Father's progress reintegrating with L.A., those court reports have not been included in the record on appeal. The only permanency plan Father has included in the record on appeal is his and L.A.'s permanency plan form from his April 5, 2022 case planning conference with Saint Francis.

At this point, though, it is important for this court to address the district court's handling of the State's attempts to admit Saint Francis' court reports into evidence at the first day of Father's TPR hearing. Without doing so, it is difficult to understand (1) why the State presented limited evidence at Father's TPR hearing and (2) why Father might not have included all but one of Saint Francis' case planning conference forms and none of Saint Francis' court reports in the record on appeal.

5

On the first day of Father's two-day TPR hearing, the district court judge and the State had a lengthy discussion about whether Saint Francis' court reports were admissible. Although it is unclear why the judge was telling the State how to admit Saint Francis' court reports into evidence, the State's attorney struggled to admit the court reports into evidence over Father's objections. During the judge's discussion with the State, the State explained that Saint Francis' court reports from March 30, 2022, April 27, 2022, and May 11, 2022, were not in the district court's file for L.A.'s CINC case because those court reports had "not been approved by all parties yet." Even so, when the State first tried admitting a Saint Francis court report into evidence, the judge responded as follows: "[T]here is a complete record of the case contained in the court files and some unfortunate clerk at the Court of Appeals is going to have to sort through it, but I don't think we can recreate it today." After the judge made this comment, when the State asked how it should handle the exhibits it intended to admit into evidence, the judge told the State that it needed to withdraw the exhibits.

In addition, although the district court judge looked through the judicial file of L.A.'s CINC case from the bench at the first day of Father's TPR hearing, nothing in the record on appeal indicates that the judge read any of Saint Francis' court reports in the judicial file from the bench. Instead, the judge was actively searching for Saint Francis' court reports within the record as he spoke to the State's attorney. Perhaps the judge read the judicial file of L.A.'s CINC case before the first day and second day of Father's TPR hearing. But again, nothing in the record on appeal indicates that the judge read the court file between the two hearing dates. On top of this, towards the end of the judge and the State's lengthy discussion about admitting Saint Francis' court reports, the judge and the parties had a discussion off the record. At any rate, by the end of the second day of Father's TPR hearing, the district court had admitted just two documents related to Saint Francis' efforts to reintegrate L.A. with Father—a court report that Saint Francis provided to the State for a November 2022 hearing, and a court report that Saint Francis provided to the State before the second day of Father's TPR hearing.

So, at Father's TPR hearing, the district court judge indicated that he was taking judicial notice of Saint Francis' court reports while reviewing those court reports for the first time from the bench. He indicated that he could rely on any Saint Francis court report previously filed with the district court because those reports were part of the district court's files. He told the State to withdraw its exhibits. At the same time, he recognized that the record he was reviewing, and creating for the Kansas Court of Appeals, was disorganized. See *In re K.H.*, 56 Kan. App. 2d 1135, 1141, 444 P.3d 354 (2019) (district court may take judicial notice of its own court file but only after reviewing the documents that it is taking judicial notice of). In short, the judge's statements and actions were improper and have made it more difficult (1) for both Father and the State to argue their respective positions and (2) for this court to determine whether the judge correctly terminated Father's parental rights.

Turning our attention back to the April 5, 2022 permanency plan form that Father included in the record on appeal, this form stated that Father's permanency objective was to "provide a safe and stable home and meet [L.A.'s] physical, emotional, and educational needs at all times." This form also explained that Father needed to follow or complete multiple reintegration case plan tasks. Specifically, Father's permanency plan required him to do the following:  (1) to comply with all court orders; (2) to obtain, maintain, and provide proof of appropriate housing when asked; (3) to obtain, maintain, and provide proof that he had legal income when asked; (4) to complete a parenting education class, providing proof of completion to Saint Francis; (5) to complete all documentation requested of him by the district court, DCF, and Saint Francis; (6) to maintain weekly contact with Saint Francis; (7) to notify Saint Francis of any life changes; (8) to attend "ITS or [Parenting as Teachers] services with [L.A.] and follow all recommendations" of the provider; and (9) to attend a mental health intake and follow recommendations.

Father's target date to complete all his reintegration case plan tasks was September 25, 2022. As of his April 5, 2022 case planning conference, Saint Francis

reported that Father was complying with all court orders. He was in the process of completing a parenting education class. He was attending mental health services. He was working at Foot Locker. He was also maintaining most of his other reintegration case plan tasks. Nevertheless, Saint Francis reported that Father had made no progress attending ITS or Parenting as Teachers classes. It reported concerns about Father's housing. Saint Francis noted that Father had housing but his roommates had recently been arrested for domestic violence. Of note, although not explicitly mentioned in the April 5, 2022 case planning conference form, Saint Francis also had concerns about Father's ability to maintain stable housing because he could not legally live in certain locations as a registered sex offender. Father had committed aggravated indecent solicitation of a child in 2013.

In this same form, Saint Francis discussed L.A.'s developmental progress. L.A. was almost two-and-a-half years old when the State petitioned the district court to rule L.A. as a child in need of care. As of the April 5, 2022 case planning conference, L.A. was almost three-and-a-half years old. In the April 5, 2022 case planning conference form, Saint Francis stated that since the previous case planning conference, L.A. had made significant progress "in her speech and now [spoke] in short sentences that [were] mostly clear and understandable." Although L.A. had vision issues, Saint Francis was hopeful that since seeing an optometrist, L.A. may no longer need eye surgery. It explained that after getting glasses, L.A.'s eyesight and eye muscles strengthened. It explained that L.A. was "still clingy and vie[d] for attention [from her half siblings] but warm[ed] up to others after time and reassurance." It explained that although L.A. still did "not like to wait for anything," she was being referred to New Perspectives for play therapy. It also reported that now, L.A. was mostly toilet trained other than needing a pull-up diaper at night.

Next, at a permanency hearing on May 11, 2022, the district court determined that Father and Mother had made inadequate progress towards reintegrating with L.A. The

district court determined that L.A.'s reintegration with either Mother or Father may no longer be a viable option. Then, it scheduled a joint hearing on whether to terminate Mother's or Father's parental rights over L.A. About four months later, the State filed a motion to terminate Father's and Mother's parental rights. In its motion, the State explained the history of L.A.'s CINC case. In short, the State asserted that Father's actions and inactions throughout the history of L.A.'s CINC case proved that he was unfit by reason of conduct or condition that made him unable to properly care for L.A. and unlikely to become capable of properly caring for L.A. in the foreseeable future for multiple reasons under K.S.A. 38-2269, which includes a list of nonexclusive factors that the district court may rely on when evaluating parental fitness.

Ultimately, at the November 9, 2022 joint hearing on whether to terminate Father's and Mother's parental rights over L.A., Mother voluntarily relinquished her parental rights. Afterwards, the district court continued all of its previous orders as well as Father's TPR hearing. In the end, Father's bifurcated TPR hearing occurred on January 4, 2023, and February 22, 2023. When Father's TPR hearings occurred, L.A. was about four years and two months old. This means that as of January 4, 2023, L.A. had lived with her foster parents for 20 months, which was about 40 percent of her life.

At the first day of Father's TPR hearing, to support the State's termination motion, it relied on the testimony of Sage, as well as April Palya, a Saint Francis case manager who worked with the family; L.A.'s foster mother (Foster Mother); Chante Fontenot, a Saint Francis permanency specialist who worked with the family; and Chalynia Carroll, L.A.'s special education teacher. Father's defense, which he presented at the second day of his TPR hearing, hinged on his own testimony.

Sage testified about her involvement in L.A.'s CINC case as a DCF social worker who investigated reports involving children in need of care. During her testimony, Sage

9

essentially repeated what she reported in the affidavit she wrote to support the State's March 30, 2021 motion to rule L.A. as a child in need of care.

Palya testified that she was the case manager for L.A.'s CINC case from when L.A. entered DCF custody in April 2021 until June 2022. Concerning Father's progress and difficulties following and completing his reintegration case plan tasks, Palya recognized that Father was receiving workers compensation after being injured at his job with Foot Locker. She recognized that Saint Francis stopped requesting Father to take drug tests because his drug tests consistently established that he was not consuming alcohol or using illegal drugs. When testifying about whether Father's current housing was appropriate, although she raised concerns about Father's ability to afford his current housing long term, Palya recognized that Father's current housing "appeared okay." Additionally, she testified that Father interacted appropriately with L.A. during visits that occurred at Saint Francis' office.

But Palya also testified that during Father's CINC case, he started a parenting class but was unsuccessfully discharged from that class for lack of progress and participation. She testified that while serving as case manager, Father initially provided documentation that he was receiving mental health services, attending therapy, and on a medication management plan. But she also explained that it was her understanding that he was no longer providing Saint Francis proof that he was still following those case plan tasks as required. Palya testified that although Father's housing currently appeared appropriate, Saint Francis still had concerns about his housing. She testified that historically, Father had consistently failed to complete and return documentation as asked by Saint Francis related to housing.

Palya explained that originally, Father was allowed to have overnight visits with L.A. During the several months Father was allowed to have overnight visits with L.A., Father was living in his uncle's home. But while living with his uncle, Father never

10

signed releases allowing Saint Francis to do a background check on his uncle. Palya explained that when a Saint Francis worker was finally allowed to inspect his uncle's home, Saint Francis determined that L.A.'s living space within the home was too small. She testified that L.A.'s sleeping space was in the closet of the bedroom that Father and his wife were sleeping in. She testified that L.A.'s bed—a toddler's bed—was too small for her. And she testified that at one point, the home was infested with roaches.

Palya testified that Saint Francis also had consistent concerns about whether Father was feeding L.A. during her overnight visits. Because L.A.'s foster parents lived some distance from his uncle's home, Saint Francis arranged transportation so L.A. could travel to the uncle's home when Father had overnight visits. According to Palya, one of the drivers who transported L.A. to her visitations with Father, as well as Foster Mother, reported that L.A. was incredibly hungry after her overnight visits. When she returned to her foster parents' home, she "was wanting to eat everything in sight." Palya testified that once, when someone asked L.A. what she had eaten during her overnight stay with Father, she said that yogurt "was the only thing she had eaten while she was on her visit."

Palya explained that based on (1) Father's failure to sign the required background check release for his uncle and (2) Father's failure to properly feed L.A., Saint Francis stopped allowing Father to have overnight visits with L.A. Instead, Saint Francis started limiting Father's visitation to supervised office visits. Still, Palya explained that when Father's visitations were supervised in Saint Francis' office, he failed to bring food and supplies, like diapers, for L.A. as previously directed. She then testified that it was her understanding that since she stopped managing L.A.'s CINC case in June 2022, Father was bringing food or using DoorDash, a food delivery service, to have food delivered to Saint Francis' office.

Palya additionally testified about Father missing nearly one-half of his scheduled visitations with L.A. Palya testified that while Saint Francis allowed Father to have

scheduled visits "in the home," he missed or cancelled 10 to 12 of his 20 scheduled visitations. She testified that sometimes Father contacted Saint Francis, providing last-minute reasons why he would miss the scheduled visit. But other times, Father provided no explanation why he missed his scheduled visitations with L.A. L.A.'s foster parents lived about two-and-a-half hours away from Saint Francis' office. This meant that if Father failed to attend his scheduled visitations in Saint Francis' office, L.A. traveled about five hours round trip without seeing Father as she expected.

Palya explained what happened when Father missed his scheduled visits with L.A. She described how L.A. became distraught:

"[L.A.] would become very upset because she would stand at the door waiting for [Father's] arrival and then would start to become very upset and sob and cry and ask why [Father was not] there. . . . [S]o one of the case team members or one of the staff members would have to console her and [they] would feed her. . . . [I]n several of those instances, the driver needed to take a break to be able to head back out on the road. And, so, . . . the case team would sit with [L.A.] and play with her during those visits and try to make sure that she ate and was consoled, . . . because she was very upset."

When directly asked whether Palya thought Father's parental rights over L.A. should be terminated, she testified that termination of his rights would be in L.A.'s best interests. She explained that Father had made minimal progress completing his reintegration case plan tasks, was "on the verge of eviction" from his current home, was not attending mental health services as directed, and was not acting as if he could safely care for L.A. Palya also emphasized that L.A. had been in DCF custody "for a very significant amount of time."

Fontenot's testimony essentially echoed Palya's testimony about Father's progress of following and completing his reintegration case plan tasks. She explained that as the permanency specialist of L.A.'s CINC case, she helped create and explain Father's

12

reintegration case plan tasks. She testified that although Father's current housing was appropriate, he had difficulties setting up utilities in his current home. It took Father several weeks to get water connected to the home. She testified that under Father's current monthly budget, he could not maintain his housing. She asserted that for Father to pay for the basic necessities to care for L.A., he would need to make $22 more a month; this calculation did not include Father's legal expenses or "the back payment that he owe[d] on his current residence." She explained that although Father originally attended his visitations with L.A., he eventually started missing visitations. Fontenot described Father's absences as "no-shows." She testified that when she asked Father why he missed one scheduled visit, Father told her that he was donating plasma. She testified that when she asked him about missing a different scheduled visit, Father told her that he had an appointment relating to his workers compensation.

When directly asked what she believed were L.A.'s best interests, like Palya, Fontenot recommended that the district court terminate Father's parental rights. She specifically believed that termination was in L.A.'s best interests for the following reasons: (1) because L.A. had been in DCF custody for "an extended period of time"; (2) because Father had not made adequate progress completing his reintegration case plan tasks; (3) because Father's conduct and lifestyle were unstable; and (4) because L.A. "present[ed] a specific set of challenges" that required parental stability and consistency.

Foster Mother testified that she and her husband became L.A.'s foster parents when L.A. entered DCF custody in April 2021. When asked about L.A.'s demeanor when she first met L.A., Foster Mother explained that she felt terrible describing L.A. this way, but L.A. reminded her of a "[f]eral cat." She explained that L.A. was standoffish, tense, and fidgety. She stated that while in her care, L.A. has always had "tantrums" during which she engaged in self-harm. This included throwing herself on the ground, biting herself, pulling at her fingers, and clawing at her clothes. Foster Mother explained that L.A. continued to attend therapy to address this troubling behavior. She testified that L.A.

did not always have tantrums or engage in self-harm following visitations with Father. She testified that although she did not always notice L.A.'s behavior changing when Father missed his scheduled visitations, L.A. sometimes responded by saying that she "miss[ed her] mommy and daddy." She further testified that L.A. suffered from anxiety and abandonment issues. As an example, Foster Mother explained that sometimes L.A. needed 15 to 20 minutes to calm down after she dropped her off at preschool. Additionally, she explained that it took about four to five months for L.A. to start trusting her.

Carroll's testimony about her experiences with L.A. as L.A.'s special education preschool teacher also addressed L.A.'s anxiety problems. Nevertheless, Carroll asserted that since L.A. became her student in March 2022, she had become more relaxed and was learning to "play with [her] peers."

The State rested its case at the end of the first day of Father's TPR hearing on January 4, 2023. Father presented his entire defense relying on his own testimony during the second day of his TPR hearing on February 22, 2023. Regarding the conditions of Mother's house when L.A. entered DCF custody, Father first testified that he did not know that Mother's house was unsafe because "[a] mutual friend of [his and Mother] stated that she cleaned the house and that it stayed clean." He also testified that he did not remember when L.A. entered DCF custody because of the safety concerns inside Mother's house.

Concerning his reintegration case plan tasks, when asked whether he remembered attending case planning conferences to help reintegrate L.A. with him, Father testified that he could not remember. All the same, Father testified that he believed that his progress completing his reintegration case plan tasks was adequate despite not having followed or completed all of those tasks. Father complained about Saint Francis taking issue with him living with his uncle. He testified that "they okayed" him living with his

14

uncle on a temporary basis, including okaying L.A.'s sleeping space in the closet. When Father's attorney asked him who he was referring to by saying "they," he initially said that he could not recall who specifically told him this. Then, he suggested that he "assumed" his living arrangements with his uncle were okay because Saint Francis was still trying to help him regain custody of L.A. Father also testified that while living with his uncle (1) he tried to save enough money to move out of his uncle's home and (2) Father had additional limitations obtaining and maintaining housing because he was a registered sex offender.

Similarly, Father denied failing to feed L.A. during visitations. Father asserted that nobody from Saint Francis ever told him that L.A. was receiving inadequate food. He explained that upon learning that Saint Francis believed L.A. was not being fed enough during visitations at the first day of his TPR hearing, he started "cooking [L.A.] more stuff, like big people stuff." Then, when his attorney tried to ask him another question about feeding L.A. by pointing to the first day of his TPR hearing, Father testified that he could not remember all of that first day, which had occurred about a month-and-a-half earlier.

As for why he missed scheduled visitations with L.A., Father testified that the 6 to 10 visitations that he believed he had missed were "more due to the COVID." But when asked by the State why he missed certain scheduled visitations with L.A., Father testified that he chose to attend his doctor's appointments related to his work injury that were scheduled at the same time as those visitations. When asked by the State about using a calendar on his cellphone to manage his time and appointments, Father gave a nonresponsive answer: "I have trouble remembering things that are of less importance to me. Doctor's appointments aren't really important for me, if that—they didn't use to be." Immediately afterwards, the State's attorney asked Father whether his doctor's appointments were "important if they conflict[ed] with visits with [L.A.]," noting that L.A. became very upset when he missed visitations. Father responded, "Yes, ma'am."

15

Then, the State's attorney noted that L.A. needed special services that would require her to attend many doctors' appointments. The State's attorney then asked Father how he would remember L.A.'s appointments if he could not remember his own appointments. Father responded that he had a phone. When the State asked Father if he had any way to transport L.A. to her doctors' appointments, Father testified that he did not have a car. But he intended to use the car his father allowed him to borrow on Mondays, Wednesdays, and Fridays after his father got off work.

He testified that he may receive permanent disability based on his injuries while working at Foot Locker for 15 days during December 2021. In doing so, he stressed that he was receiving workers compensation payments from being injured at his job with Foot Locker. But he also explained that he and his wife currently had no income other than his weekly $432 workers compensation payment. He suggested that his workers compensation payment was enough money to pay for the essentials needed to care for L.A. Father then testified that he was not facing eviction because he had "an arrangement with [his] landlord" that would allow him to get "caught up on the rest of the bills." This included paying utility debts. Also, when asked a series of questions about his specific finances by the State, Father testified that his income would increase if he had custody of L.A. because then, he could apply for food assistance. He added that if he "wasn't being terminated, [he] would actually be able to receive help" buying groceries.

Father testified that he had completed a parenting course in the fall of 2022. He asserted that he had used skills he learned in this parenting course during his visitations with L.A. He testified that when L.A. did something that L.A. was not supposed to do, he calmly corrected her poor behavior. He also suggested that L.A.'s behavior had become more troubling since entering DCF custody. He testified that before entering DCF custody, L.A. had just one "meltdown."

When Father's attorney asked Father about a specific parenting course that he was supposed to attend, Father was unsure whether he or L.A. needed to complete that course. Father recognized that he had failed to complete "[a] couple of the courses" required by his reintegration case plan. In doing so, he testified that he failed to complete one course because he had overslept due to medicine he was taking. When his attorney asked him the name of the medication that made him oversleep and miss the parenting class he attended, though, Father testified that he could not remember.

At the same time, Father remembered that the medicine was for his depression and anxiety. He also admitted that he stopped taking this medicine for about three months because he lost his medical insurance. Father explained that since getting on state medical insurance about a month earlier, he started taking his medication again. While testifying about his medical insurance, Father emphasized that he had to acquire state medical insurance because he "[did not] have the kids." He implied that if he had custody of L.A., he would be able to obtain different medical insurance. As for Saint Francis' request that he attend therapy, he testified that he had stopped attending therapy because he believed that he did not need it. He recognized that this was one of his required reintegration case plan tasks. But Father testified that the Saint Francis staff was mistaken in making him attend therapy because they wrongly believed that he "would have a moment of weakness and take [his] anger out on [his] child," which he was not concerned about.

As for signing and returning documents when Saint Francis requested, Father testified he had no issues signing releases and other paperwork. Rather, anytime he failed to timely provide documents to Saint Francis, he had simply "forgotten to bring [the documents] by the office." While saying this, Father also testified that he had eventually signed and returned all of the documents that Saint Francis requested. Although he recognized that he did not always maintain weekly contact with Saint Francis as required, Father testified that Saint Francis' staff sometimes wrongly concluded that he had failed to maintain weekly contact. He testified that Saint Francis was understaffed, and he

17

alleged that its employees did not always answer their phones or timely respond to their voicemails.

When Father's attorney directly asked him why the district court should not terminate his parental rights over L.A., Father testified that it would be unfair because he had done everything that Saint Francis had asked him to do to reintegrate with L.A.:

"I don't believe that my rights should be terminated for the simple fact that I've done everything that [Saint Francis has] asked of me up to this point. Some of it may have [taken] a little longer to do, but it was still done. I've showed up every single time they wanted a drug test, which is a main concern[.] I know that for a fact because of everything else. . . . I do have stable income, whether it seems like it—I am able to take care of what I need to take care of, it just took some time to catch up, if that makes sense, but now that I've been caught up, I have . . . everything is stable.

"The relationship I have with my daughter is amazing. Every single time she comes over she's super excited to see me and that makes my heart melt. I believe I've been a good father so far, even before we were in court and everything. I used to show up every day. I'd feed [L.A., Older Sibling, and Younger Sibling] dinner and then I'd send them to bed and that was when I . . . had the agreement with [Mother]."

In Father's closing argument, Father essentially repeated his hearing testimony. He essentially argued that he had made adequate progress completing his reintegration case plan tasks in light of his specific circumstances. He asserted that in making its decision, the district court should focus on the progress that Father had recently made to complete more reintegration case plan tasks. The State counterargued that Father's own testimony established that the district court should terminate his parental rights over L.A. as it requested in its termination motion. It argued that Father failed to take advantage of the resources Saint Francis provided him to help timely reintegrate with L.A. It argued that Father's testimony blamed others instead of taking responsibility for his own actions that resulted in him not making adequate progress completing his reintegration case plan tasks. The State emphasized that Father answered that he could not remember when

18

responding to questions about basic facts of his reintegration case plan tasks and L.A.'s CINC case. It argued that contrary to Father's testimony that he could provide L.A. with the basic necessities, Father's explanation of his budgeting raised more concerns about whether he could provide those necessities if reintegrated with L.A. L.A.'s guardian ad litem also asserted that Father's efforts to reintegrate with L.A. were inadequate. In particular, the guardian ad litem stressed that as of that date, L.A. had been in DCF custody for a substantial portion of her life.

The district court agreed with the State and the guardian ad litem. It determined the clear and convincing evidence supported the termination of Father's parental rights over L.A. for four reasons: (1) because she had been physically, mentally, and emotionally abused under K.S.A. 38-2269(b)(4); (2) because Saint Francis' reasonable efforts to reintegrate L.A. with Father had failed under K.S.A. 38-2269(b)(7); (3) because Father failed to adjust his circumstances, conduct, or conditions to meet L.A.'s needs under K.S.A. 38-2269(b)(8); and (4) because Father's actions and inactions resulted in L.A. being in DCF custody for 15 of the past 22 months under K.S.A. 38-2269(b)(9). Nevertheless, after the district court made its parental unfitness ruling from the bench, the district court never addressed whether termination of Father's parental rights over L.A. was in L.A.'s best interests. Also, in its order terminating Father's parental rights over L.A., which was a standard TPR order form, the district court did not check the box stating that termination of Father's parental rights over L.A. was in L.A.'s best interests.

Father timely appeals the termination of his parental rights over L.A.

ANALYSIS

*Did the district court err when it terminated Father's rights over L.A.?*

K.S.A. 38-2269(a) states that after the district court has determined a child as a child in need of care, the court may terminate the parent's rights over the child if clear and convincing evidence establishes that the parent is unfit by reason of conduct or condition which renders the parent unable to properly care for his or her child and the conduct or condition is unlikely to change in the foreseeable future. In this case, the district court determined that Father was unfit to properly care for L.A. and was unlikely to become fit to properly care for L.A. in the foreseeable future by relying on K.S.A. 38-2269(b)'s nonexclusive list of factors that may support terminating a parent's rights over his or her child. As just outlined, the district court specifically relied on K.S.A. 38-2269(b)(4), (b)(7), (b)(8), and (b)(9). Those subsections of K.S.A. 38-2269 provide as follows:

> "(b) In making a determination of unfitness the court should consider, but is not limited to, the following, if applicable:
>
> . . . .
>
> (4) physical, mental or emotional abuse or neglect or sexual abuse of a child;
>
> . . . .
>
> (7) failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family;
>
> (8) lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child; and
>
> (9) whether, as a result of the actions or inactions attributable to the parent and one or more of the factors listed in subsection (c) apply, the child has been in the custody of the secretary and placed with neither parent for 15 of the most recent 22 months beginning 60 days after the date on which a child in the secretary's custody was removed from the child's home.
>
> . . . .
>
> "(c) In addition to the foregoing, when a child is not in the physical custody of a parent, the court, shall consider, but is not limited to, the following:

"(1) Failure to assure care of the child in the parental home when able to do so;

(2) failure to maintain regular visitation, contact or communication with the child or with the custodian of the child;

(3) failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home . . . ."

After a district court determines a parent unfit under K.S.A. 38-2269(a), the district court must consider whether termination of the parent's rights is in the best interests of the child:

"If the court makes a finding of unfitness, the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child. In making the determination, the court shall give primary consideration to the physical, mental and emotional health of the child. If the physical, mental or emotional needs of the child would best be served by termination of parental rights, the court shall so order. A termination of parental rights under the code shall not terminate the right of a child to inherit from or through a parent. Upon such termination all rights of the parent to such child, including, such parent's right to inherit from or through such child, shall cease." K.S.A. 38-2269(g)(1).

When reviewing whether clear and convincing evidence supports the district court's termination of a parent's rights over a child on appeal, this court considers whether after reviewing all the evidence in the light most favorable to the State, whether the district court's fact-findings are deemed highly probable. *In re K.H.*, 56 Kan. App. 2d at 1139. While engaging in this review, this court may not reweigh the district court's fact-findings on conflicting evidence or credibility determinations. 56 Kan. App. 2d at 1139. Also, to the extent that this court must interpret K.S.A. 38-2269 when reviewing issues involving termination of parental rights, interpretation of a statute is a question of law over which this court exercises unlimited review. 56 Kan. App. 2d at 1139-40.

Here, Father makes two arguments on appeal why this court should reverse the termination of his parental rights over L.A. First, Father argues that because the State failed to present clear and convincing evidence of his parental unfitness, the district court's parental unfitness rulings were not supported by clear and convincing evidence. Second and alternatively, Father argues that this court must reverse the termination of his parental rights over L.A. because the district court never considered whether terminating his rights was in L.A.'s best interests as required under K.S.A. 38-2269(g)(1).

Father's first argument that the State failed to present clear and convincing evidence allowing the district court to terminate his parental rights under K.S.A. 38-2269(b)(4), (b)(7), (b)(8), or (b)(9) is against reason. In his appellant's brief, Father challenges each of the district court's parental unfitness rulings. Essentially, the State responds that overwhelming evidence supports the district court's rulings that Father was unfit as evidenced by his historical conduct and ongoing failure to properly care for L.A. during the duration of L.A.'s CINC case. Although the State just addresses the overwhelming evidence supporting Father's parental unfitness as meant under K.S.A. 38-2269(a), there are two reasons why this court rejects Father's argument that the district court erred by ruling him unfit.

In challenging the district court's parental unfitness rulings, Father contends that the district court could not determine him unfit under K.S.A. 38-2269(b)(4) because no evidence supported that he physically, mentally, or emotionally abused or neglected L.A. According to Father, the district court erred by making this ruling because the hearing evidence proved that Mother was the sole parent who abused or neglected L.A. Father's arguments concerning the district court's parental unfitness rulings under K.S.A. 38-2269(b)(7) and (b)(9) hinge on whether the district court ignored evidence supporting his arguments. In challenging the district court's ruling under subsection (b)(7) that he failed to make adequate progress towards reintegration with L.A. despite Saint Francis' reasonable efforts to reintegrate L.A. with him, Father suggests that the district court

wrongly ignored his "undisputed testimony" about his therapy efforts. In challenging the district court's unfitness ruling under subsection (b)(7), Father contends that the district court wrongly ignored that Saint Francis staff who worked on L.A.'s CINC case created problems that prevented him from completing his reintegration case plan tasks. Similarly, he contends that the district court "failed to consider the significant progress [he] made while working the case." Indeed, this is also Father's only argument why the district court erred by ruling him unfit under K.S.A. 38-2269(b)(9). Father believes that the district court should have "credit[ed]" him for the "lifestyle" changes that he had made while trying to regain custody of L.A. even though L.A. had been in DCF custody for 22 months of her life.

As for the district court's parental unfitness ruling under K.S.A. 38-2269(b)(8) that he failed to adjust his circumstances to meet L.A.'s specific needs, Father implies that the district court terminated his parental rights because of his indigency. When ruling from the bench, though, the district court focused on the time that Father had to complete his reintegration case plan tasks. It mentioned Father's income in the context of him not having located stable and long term housing despite having enough time to do so. It mentioned Father's finances because Palya's, Fontenot's, and Father's testimonies established that Father was living on a tight budget that may result in him losing stable housing that L.A. needed.

In short, in making each of his arguments, Father cherry picks facts while also asking this court to believe his testimony. But this violates this court's well-known rule against reweighing the district court's fact-findings on conflicting evidence and credibility determinations when analyzing a district court's decision under the clear and convincing standard of review. See *In re K.H.*, 56 Kan. App. 2d at 1139. Thus, this court must reject all of Father's arguments that the district court erred by ruling him unfit because his conduct or condition established that he was unable to properly care for L.A.

and that Father was unlikely to become fit to properly care for L.A. in the foreseeable future.

Notwithstanding this inherent problem with Father's parental unfitness arguments, as the State asserts in its brief, the evidence supporting the district court's parental unfitness rulings was overwhelming. But before engaging in this analysis, it is important for this court to recognize that the State's attorney told the district court that some of Saint Francis' court reports were not in the court's file because those reports had "not been approved by all parties yet." Yet, it is readily apparent that the district court's directions resulted in the State not admitting certain court reports. Although this court can only speculate, it is possible the district court's directions also resulted in the State's attorney not even trying to admit the case planning conference forms that Saint Francis compiled detailing Father's progress completing his reintegration case plan tasks throughout L.A.'s CINC case. Father has not challenged the district court's decision regarding the admission of any evidence on appeal. As a result, Father has waived and abandoned any complaint that he may have had regarding the district court's actions while the State attempted to admit Saint Francis' court reports. See *Estate of Kirkpatrick v. City of Olathe*, 289 Kan. 554, 571, 215 P.3d 561 (2009) (an issue not raised on appeal is deemed waived and abandoned).

In any case, Father's own testimony at his TPR hearing supported each of the district court's parental unfitness rulings. Father testified that during the 22 months that L.A. was in DCF custody he failed to complete two of his required parenting courses. He testified that he chose to stop therapy at one point because he did not believe he needed therapy to address Saint Francis' concerns that he may physically abuse L.A. He would not concede that he failed to follow his reintegration case plan task to complete and return all intake and other documents requested by Saint Francis. Instead, he testified that he had just forgotten to return the completed documents to Saint Francis. As the State pointed out when cross-examining Father, Father could not recall many things when he

24

testified. He testified that he could not use his cellphone's calendar application to remember his own appointments. Nevertheless, immediately after saying this, he testified that he would be able to use his cellphone's calendar application to remember L.A.'s appointments.

Palya's, Fontenot's, and Foster Mother's testimonies supported that L.A. was not being properly fed by Father when she had unsupervised overnight visitations with him as well as when he attended his supervised visitations with L.A. at Saint Francis' office. Palya and Fontenot testified that Father knew about their concerns with whether L.A. was being properly fed. At his TPR hearing, Father testified that until recently, nobody from Saint Francis told him that they were concerned about whether L.A. was receiving adequate food. Because Father had previously used DoorDash to deliver food to Saint Francis' office, though, Father's assertion that nobody employed at Saint Francis told him that he needed to feed L.A. during his supervised visits is specious.

Although Father must prioritize attending doctor's appointments related to his work injury so he could continue to receive workers compensation, his inaction to ensure that he could attend his doctor's appointments and his scheduled visitations with L.A. is inexcusable. While being cross-examined by the State's attorney, Father seemingly recognized that attending the scheduled visitations with L.A. was important. At the very least, from the State's evidence from the first day of Father's TPR hearing as well as the State's cross-examination of Father, Father should have known that L.A. became distraught when he failed to attend scheduled visitations at Saint Francis' office after traveling about two-and-a-half hours to attend the visitations. Although Father provided a nonresponsive answer to the State's attorney's question about managing his time and appointments, Father's testimony indicated that he prioritized his doctor's appointments over his scheduled visitations with L.A. Once again, Father explicitly testified that he had "trouble remembering things that [were] of less importance to [him]." Also, Father lived in Junction City, Kansas—the city where Saint Francis' office was located. L.A. had to

25

travel about five hours round trip to attend the scheduled visitations. Father merely needed to adjust his schedule and travel to Saint Francis' office, which was within the city he resided. Overall, Father's testimony revealed that he lacked the empathy required to properly care for a child, let alone care for L.A. and her special needs.

In fact, Father's testimony indicated that regaining custody of L.A. was part of his plan to take care of himself. Although Father explained that he had acquired medical insurance through the State since losing custody of L.A., he also testified that he had to find a new medical insurance plan because he did not have custody of L.A. He explained that he would be able to save more money if he had custody of L.A. because if he had custody of her, he could apply for food assistance with the State. Relatedly, Father suggested that he intended to live off of workers compensation payments. He further suggested that he may eventually live off of permanent disability payments related to his work injury. Despite having no income outside of his workers compensation payments, Father insisted that his finances were stable. He explicitly testified that he had "everything . . . stable" as it concerned his ability to make ends meet.

During other testimony as well as his response to his attorney's question about why the district court should not terminate his parental rights over L.A., Father provided conflicting testimony about whether he knew L.A. was living in dangerous conditions while in Mother's custody. When Father's attorney directly asked Father whether he knew about the unsafe conditions inside Mother's house, Father testified that he was unaware of the dangerous conditions. He explained that he believed Mother's house was clean because a mutual friend had told him so. Yet, he had previously testified that under his informal custody arrangement with Mother, he "went and visit[ed L.A., Older Sibling, and Younger Sibling] every day after [he] got off work." Then, when explaining why the district court should not terminate his parental rights over L.A., Father testified that he had been a "good father" because he "used to show up every day." Although Father's testimony is somewhat ambiguous, he testified that under his and Mother's informal

26

custody arrangement, he would go over to Mother's house, feed L.A., Older Sibling, and Younger Sibling, and then "send them to bed."

So, Father's own testimony supports that under this informal custody arrangement, Father would have known that Mother's house was unsafe. Thus, reviewing the evidence in the light most favorable to the State, there is ample evidence that Father knew (1) that Mother's house was unsafe and (2) that Mother was neglecting L.A. Also, regardless of whether Father ever went inside Mother's house as his own testimony supports, a prudent parent would question whether Mother was properly caring for L.A. given the overwhelming evidence about the dilapidated condition of Mother's house.

Lastly, although Father testified that he only observed L.A. have one "meltdown" before entering DCF custody, the evidence showing that L.A. has special needs and has consistently engaged in aggressive behaviors undermines Father's contention. L.A. underwent medical testing when she entered DCF custody to correct an unaddressed vision issue that might ultimately require her to undergo surgery. Once in DCF custody, it was determined that L.A. has special needs. So, she started attending a preschool for children with special needs. Foster Mother reluctantly testified that when she first started caring for L.A. in April 2021, L.A. behaved like a feral cat. She explained that L.A. has always had tantrums during which she sometimes engaged in self-harm. This means that L.A. was engaging in self-harming behaviors before she was even two-and-a-half years old. Once more, L.A. was not even two-and-a-half years old when she was removed from her parents' custody.

To summarize, the district court correctly determined that Father was presently unfit and unlikely to become fit to properly care for L.A. in the foreseeable future under K.S.A. 38-2269(b)(4), (b)(7), (b)(8), and (b)(9). The hearing evidence showed that L.A. had endured physical, mental, and emotional abuse as well as neglect under Father's care as meant under subsection (b)(4). The hearing evidence showed that Father failed to take

27

advantage of Saint Francis' reasonable efforts to reintegrate L.A. with Father as meant under subsection (b)(7). The hearing evidence showed that Father failed to adjust his conduct and circumstances to meet L.A.'s basic needs, let alone her special needs, as meant under subsection (b)(8). In addition, the hearing evidence showed that Father failed to maintain visitation with L.A. and carry out Saint Francis' reasonable reintegration case plan tasks, as outlined under subsections (c)(1), (c)(2), and (c)(3) of K.S.A. 38-2269. Thus, clear and convincing evidence supported the district court's parental unfitness ruling. As a result, we affirm the district court's ruling that Father was unfit to care for L.A. and was unlikely to become fit to properly care for L.A. under K.S.A. 38-2269(b)(4), (b)(7), (b)(8), and (b)(9).

Although clear and convincing evidence supports the district court's parental unfitness rulings, Father's second and alternative argument about the district court failing to consider whether termination of his parental rights was in L.A.'s best interests is persuasive. K.S.A. 38-2269(g) expressly requires the district court to consider whether termination of the parent's rights over the child is in the child's best interests before terminating the parent's parental rights. If termination is not in the child's best interests, then the district court cannot terminate the parent's rights.

Here, after ruling from the bench that Father was unfit to parent L.A. as meant under K.S.A. 38-2269(a), the district court never addressed whether termination of Father's parental rights over L.A. was in L.A.'s best interests. Also, although the district court was required to consider L.A.'s best interests when it made its ruling from the bench, it is important to reiterate that the district court's order terminating Father's parental rights over L.A. was a standard TPR form. On this form, the district court did not check the box saying that termination of Father's rights was in L.A.'s best interests. In other words, the district court did not make any best interests rulings addressing L.A.'s specific needs in its order either.

28

In its appellate brief, the State asserts that this court should affirm the district court's termination of Father's parental rights although the district court never explicitly referred to L.A.'s best interests when terminating Father's parental rights because it implicitly addressed L.A.'s best interests while ruling Father unfit. Yet, this is not the standard under K.S.A. 38-2269(g)(1): "If the court makes a finding of unfitness, the court *shall* consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." (Emphasis added.) Also, this court has previously held that subsection (g)(1)'s plain language required it to reverse the district court's termination of parental rights when the district court terminated a parent's rights without considering the child's best interests. See *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011); *In re A.M.W.*, No. 101,997, 2009 WL 3428821, at *2 (Kan. App. 2009) (unpublished opinion); *In re B.B.*, No. 100,212, 2008 WL 4850081, at *2 (Kan. App. 2008) (unpublished opinion).

Thus, although clear and convincing evidence supports the district court's ruling that Father was unfit and unlikely to become fit to properly care for L.A.'s needs in the foreseeable future, the district court could not legally terminate Father's parental rights without addressing whether termination was in L.A.'s best interests. As a result, we affirm the district court's rulings that Father was unfit and unlikely to become fit within the foreseeable future to properly care for L.A. But we reverse the district court's termination of Father's parental rights over L.A. and remand this case to the district court for the sole legal determination whether termination of Father's parental rights over L.A. is in L.A.'s best interests.

Affirmed in part, reversed in part, and remanded with directions.